IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGSAVER LLC, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 11-997 |
| | : | |
| FMC CORPORATION, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　June 9, 2011

Currently pending before the Court is the Motion of Defendant FMC Corporation for Disqualification of Plaintiff AgSaver LLC's Counsel. For the following reasons, the Motion is denied.

**I.　　FACTUAL HISTORY**

　　**A.　　Basis of the Litigation**

According to the facts set forth in the Amended Complaint, Plaintiff AgSaver LLC ("AgSaver") is an Arkansas limited liability corporation holding seven pesticide registrations with the United States Environmental Protection Agency ("EPA"), and with several additional pesticide registration applications pending with the EPA. (Am. Compl. ¶ 2.) Defendant FMC Corporation ("FMC") is a Delaware Corporation that holds over 270 EPA pesticide product registrations and is the assignee of more than 1,000 patents. (Id. ¶ 3.)

Plaintiff alleges generally that Defendant has violated 35 U.S.C. § 292 by marking products it manufactured, distributed, marketed, or sold as being covered by a patent when those products were not actually covered by a valid patent. (Id. ¶ 6.) Specifically, Plaintiff asserts that FMC is the

owner of three expired patents for pesticides. The first – United States Patent No. 4,238,505, issued on December 9, 1980 – expired on June 25, 1999. (Id. ¶¶ 7-8.) The second – United States Patent No. 4,405,357, issued on September 20, 1983 – expired on May 11, 2001. (Id. ¶¶ 9-10.) Finally, the third – United States Patent No. 4,024,167, issued on May 17, 1977 – expired on August 13, 1994. (Id. ¶¶ 11-12.) FMC holds registrations from the EPA for multiple products which were at one time covered by the use of these three patents. It marketed such products either under the name "Command" ("Command Line Products" - '357 Patent), the names "Capture," "Brigade," or "Talstar" (collectively, the "CBT Line Products" – '505 Patent), or "Pounce" or "Dragnet" (collectively the "Pounce/Dragnet" Line Products – '163 Patent). (Id. ¶¶ 30-36.) For all of these product lines, FMC has allegedly marked, affixed to, or used in advertising – and continues to do so – the word "patent" or other words or numbers implying patents. (Id. ¶¶ 31, 33, 36.)

Plaintiff AgSaver sells several products which contain the same active ingredient as, and compete with, FMC's CBT Line Products identified in the Amended Complaint. (Id. ¶¶ 34, 37.) In light of such competition, Plaintiff avers that FMC, a sophisticated pesticide manufacturing company, has continued to mark and advertise its CBT Line Products, its Command Line Products, and its Pounce/Dragnet Line Products with words or numbering indicating that such products are patented with the intent to deceive the public and to deter existing and potential competing registrants from seeking generic registration of products containing the same active ingredients. (Id. ¶¶ 38-40, 42.) In support of this allegation, the Amended Complaint asserts that FMC employs experienced in-house patent counsel who are aware that patents have limited terms generally and who were aware of the terms and expiration dates of the '505, '357, and '163 Patents specifically. (Id. ¶ 41.) Despite knowing that it needed to modify its CBT Line, Command Line, and Pounce/Dragnet Line Product labels and advertising to remove any indicia of patents, Defendant knowingly and intentionally failed to do so. (Id. ¶¶ 55-57.)

2

Plaintiff initiated the present litigation on February 9, 2011, and filed an Amended Complaint on March 10, 2011. Plaintiff's sole cause of action contends that Defendant violated 35 U.S.C. § 292 by falsely marking, affixing, and/or advertising its CBT Line, Command Line, and Pounce/Dragnet Line Product labels. (Id. ¶¶ 58-81.)

**B.     Facts Relevant to the Motion for Disqualification**

To assist Defendant with the legal regulatory aspects of its pesticides group, Defendant FMC has long retained the law firm of Keller and Heckman LLP ("K&H"). (Decl. of John Cummings ("Cummings Decl.") ¶ 6, Apr. 13, 2011.) K&H provides to FMC "legal representation related broadly to regulation and approval requirements for chemical substances, including substances used in industrial, pesticidal, pharmaceutical end uses and uses related to foods, medical devices and cosmetics . . ." (Id. Ex. B.) The Managing Partner of K&H directly oversaw this pesticide-related work. (Decl. of Telisport W. Putsavage ("Putsavage Decl.") ¶ 9, May 2, 2011.)

Plaintiff's current counsel, Telisport W. Putsavage, was originally counsel to the firm of Wright & Sielaty, P.C., where he worked with regulatory scientists Dr. Robert Butz and Ms. Janine Gydus, and where he represented Plaintiff AgSaver or its principals and related businesses. (Id. ¶ 8; Cummings Decl. ¶ 7.) His work with AgSaver included counseling on various issues related to generic agricultural pesticides. (Id.)

In 2006, however, Mr. Putsavage joined K&H as a partner in the pesticides group. (Putsavage Decl. ¶ 6.) From 2007-2009, he provided legal representation and advice to FMC on certain regulatory matters. (Cummings Decl. ¶ 7.) According to Defendant, Mr. Putsavage directly represented FMC on legal regulatory issues related to FMC chemical products, including the VigorOx line produced by FMC for which FMC sought and gained EPA approval as a pesticide. (Decl. of Luann Maloney ("Maloney Decl.") ¶ 5 & Ex. A, Apr. 12, 2011.) More specifically, Mr. Putsavage provided legal counsel to FMC regarding EPA labeling issues concerning FMC's

3

chemical products, including VigorOx SP-15 and VigorOx 15/23.  (Id. ¶ 6 & Ex. A.)  Also during that time period, K&H counseled FMC regarding FDA approvals of Spectrum, Blitz, and other FMC chemical products and pesticides.  (Id. ¶ 3.)  None of the antimicrobial pesticides for which he provided FMC with regulatory advice are at issue in the current litigation.  (Putsavage Decl. ¶ 23.)

In July 2009, Mr. Putsavage joined the law firm of Carter Ledyard & Milburn LLP ("CLM") in its Pesticides and Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") practice group.  (Decl. of Geoffrey A. Zelley ("Zelley Decl.") ¶ 3 & Ex. A. (Apr. 13, 2011).)  Also joining him were the two scientists from K&H's pesticides group, Robert Butz and Janine Gydus.  (Id.)  Acting in his new role as a partner with CLM, Mr. Putsavage brought the present litigation on behalf of Plaintiff AgSaver, setting forth a *qui tam* action for alleged false patent markings related to three patents concerning FMC Pesticide products.

On April 14, 2011, Defendant moved to disqualify Mr. Putsavage and his firm of CLM as attorneys for Plaintiff.  Plaintiff filed a Response in Opposition on May 2, 2011.  Defendant then submitted a Reply Brief on May 9, 2011, and Plaintiff answered with a Sur-reply Brief on May 13, 2011.  This Motion is now ripe for the Court's consideration.

## II.     STANDARD FOR A MOTION TO DISQUALIFY COUNSEL

"Federal courts have inherent authority to supervise the conduct of attorneys appearing before them."  Henry v. Delaware River Joint Toll Bridge Comm'n, No. CIV.A.00-6415, 2001 WL 1003224, at *1 (E.D. Pa. Aug. 24, 2001).  To guide such supervision, the United States District Court for the Eastern District of Pennsylvania has adopted the Pennsylvania Rules of Professional Conduct.  See E.D. PA. CIV. R. 83.6, Part IV(B).  Under such Rules, one of a court's available tools is the disqualification of counsel.  Henry, 2001 WL 1003224, at *1.  "Counsel may be disqualified if the Court determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule, given the ends that the disciplinary rule is

4

designed to serve." Id. (quoting United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980)).

Notably, however, even if a court finds that counsel violated the Pennsylvania Rules of Professional Conduct, disqualification is not mandatory. Jordan v. Philadelphia Hous. Auth., 337 F. Supp. 2d 666, 672 (E.D. Pa. 2004). Rather, "[t]o disqualify opposing counsel, the moving party must clearly show that continued representation would be impermissible." Reg'l Emp'rs Assur. Leagues Voluntary Emps.' Beneficiary Ass'n ex rel. PennMont Beneficiary Servs., Inc v. Castellano, No. CIV.A.03-6903, 2005 WL 856928, at *2 (E.D. Pa. Apr. 12, 2005) (citing Cohen v. Oasin, 844 F. Supp. 1065, 1067 (E.D. Pa. 1994)). "Disqualification is a harsh measure and is generally disfavored by the court." Id. (citing Commonwealth Ins. Co. v. Graphix Hot Line, Inc., 808 F. Supp. 1200, 1203 (E.D. Pa. 1992)). The court maintains an obligation to prevent tactical efforts to disqualify opposing counsel. Id. Accordingly, when determining whether disqualification is appropriate, a court must also consider "countervailing policies, such as permitting a litigant to retain his chosen counsel and permitting attorneys to practice without excessive restrictions." Henry, 2001 WL 1003224, at *1. The party seeking disqualification bears the burden of showing that the representation is impermissible. James v. Teleflex, Inc., No. CIV.A.97-1206, 1999 WL 98559, at *3 (E.D. Pa. Feb. 24, 1999). Nonetheless, doubts regarding the existence of an ethical rule violation should be construed in favor of disqualification. Id.

### III. DISCUSSION

In the present case, Defendant seeks to disqualify Plaintiff's counsel, Telisport Putsavage, and his current law firm of CLM, from representing Plaintiff in this action. Specifically, Defendant alleges that, under Pennsylvania Rule of Professional Conduct 1.9, Mr. Putsavage has a conflict of interest due to the fact that Defendant was one of his former clients during his tenure at K&H. In turn, Defendant claims that Mr. Putsavage's current firm of CLM should be disqualified as having confidential knowledge imputed to it under Pennsylvania Rule of Professional Conduct 1.10. Upon

5

consideration of the applicable rules and pertinent jurisprudence, the Court disagrees.

Pennsylvania Rule of Professional Conduct 1.9(a) provides that:

A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which
that person's interests are materially adverse to the interests of the former client
unless the former client consents . . .

PA. RULES OF PROF'L CONDUCT R. 1.9(a). "Disqualification under Rule 1.9(a) is required if (1) the former representation is the same or substantially related to the present matter, (2) the interests of counsel's current client are materially adverse to the interests of the former client, and (3) the former client has not consented." Jordan, 337 F. Supp. 2d at 672.

In this case, the second and third elements are not in dispute. Defendant FMC is a former client of Mr. Putsavage and is being sued by Mr. Putsavage's present client AgSaver. "There is no situation more 'materially adverse' than when a lawyer's former client is in a suit against that lawyer's current client." Id. Moreover, FMC, the party bringing the Motion, clearly has not consented to such representation.

Accordingly, the Court must focus on the first factor – whether the former representation is the same or substantially related to the present matter. The mere fact that two representations involve similar or related facts is not, in itself, sufficient to warrant a finding of a substantial relationship. INA Underwriters Ins. Co. v. Nalibotsky, 594 F. Supp. 1199, 1206 n.5 (E.D. Pa. 1984). Rather, the test is whether the information acquired by the attorney in his former representation is substantially related to the subject matter of the subsequent representation. Commwealth Ins. Co. v. Graphix Hot Line, Inc., 808 F. Supp. 1200, 1204 (E.D. Pa. 1992). The two matters are "substantially related" if, after looking at the nature of the two representations, "in the course of the prior representation, the client might have disclosed to its attorney confidences which could be relevant or possibly detrimental to the former client in the present action." Henry, 2001

6

WL 1003224, at *2; see also Commwealth Ins. Co., 808 F. Supp. at 1204.

Prior decisions from this Court have converted this standard into a practical set of three guiding questions:

1. What is the nature and scope of the prior representation at issue?
2. What is the nature of the present lawsuit against the former client?
3. In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation?

Commwealth Ins. Co., 808 F. Supp. at 1204; see also Henry, 2001 WL 100324, at *2. "In answering the first question, the court should focus upon the reasons for the retention of counsel and the tasks which the attorney was employed to perform." Commwealth Ins. Co., 808 F. Supp. at 1204. "With respect to the second question, the court should evaluate the issues raised in the present litigation and the underlying facts." Id. "Finally, in answering the third question, the court should be guided by the interpretation of the word 'might.'" Id. Courts have defined the word "might" to mean either when "(a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship." Id. (citing Realco Servs., Inc. v. Holt, 479 F. Supp. 867, 871-72 (E.D. Pa. 1979)).

In light of these principles, this Court is now tasked with determining whether Mr. Putsavage's former representation of Defendant FMC is substantially related to the present case. To do so, the Court considers each of the foregoing questions individually.

### A. The Nature and Scope of the Prior Representation at Issue

The first inquiry looks into the nature and scope of the prior representation at issue. According to Defendant, from at least 2007 to 2009, Mr. Putsavage was an attorney with K&H's pesticides group. (Cummings Decl. ¶ 7.) The Declarations and billing records attached to

Defendant's Motion for Disqualification reveals that Mr. Putsavage engaged in the following activities on behalf of FMC:

- Drafting a confidential memorandum concerning pesticide and data about that pesticide. (Cummings Decl. ¶ 8.) Mr. Putsavage's conclusions were based on scientific findings by K&H scientist, Dr. Robert G. Butz. (Id.) His billing records suggest that he performed substantial data evaluation and identification of data supporting registrations for technical products, searching public databases for pending registrations for similar products, and preparation of a data valuation/assessment report. (Id., Ex. C.)

- Directly representing FMC on legal regulatory issues related to FMC chemical products, including the VigorOx line of chemical products produced by FMC for which FMC has sought and gained EPA approval as a pesticide. (Maloney Decl. ¶ 5.)

- Providing legal services to FMC related to EPA labeling, as well as other issues concerning aseptic packaging, EPA and Food and Drug Administration regulatory practice, and registration. (Id. ¶ 6.) Further review of Mr. Putsavage's billing records, supplied by FMC, revealed that he was engaged in substantial research regarding the EPA's and FDA's regulatory requirements, seeking guidance on labeling for sterilant products, reviewing documents related to efficacy issues and efficacy protocols, drafting opinion letters as to what needed to be put on to a label to comply with EPA and FDA requirements, and reviewing wastewater treatment amendments. (Id., Ex. A.)

- Providing legal counsel to FMC regarding EPA labeling issues concerning FMC's pesticide products, including VigorOx SP-15 and VigorOx 15/23. (Id. ¶ 6.)

Mr. Putsavage, however, clarifies that he is not a patent attorney, has never advised FMC concerning its patents, patent marking, or intellectual property rights, and was not privy to any information that related to FMC patents. (Putsavage Decl. ¶ 26.) Rather, he is an environmental attorney who specializes in counseling pesticide producers, distributors, retailers, and trade associations on federal and state pesticide regulatory and business matters, including product registration and cancellation, federal and state enforcement, and data compensation. (Id.) To the extent Mr. Putsavage prepared any assessments for agricultural pesticides for which FMC was considering entering the U.S. market as a generic supplier, the purpose was solely to estimate how much money FMC would have to pay the prior registrant to obtain EPA registration of the generic. (Putsavage Decl. ¶ 12.) In order to do so, he reviewed publicly accessible databases of pesticide

8

registrations and scientific data submitted to the EPA by other manufacturers in support of pesticide registrations. (Id. ¶ 13.) Although FMC may have treated the resulting memoranda as "confidential," Mr. Putsavage asserts that no confidential or proprietary information was revealed to him in connection with the assessments. (Id. ¶ 15, 18.) Moreover, he states that any legal advice as to FMC's aseptic packaging was handled primarily by other attorneys and that no issues in the current action have any relationship to aseptic packaging or antimicrobial pesticides. (Id. ¶ 22.) Finally, with respect to his advising FMC on "legal and regulatory issues related to FMC's chemical products" and provision of "legal services to FMC related to EPA labeling, . . . EPA and Food and Drug Administration ("FDA") regulatory practice[,] and registration," (Maloney Decl. ¶¶ 5-6), Mr. Putsavage avers that any such advice mainly involved review of statements describing the functions or properties of certain of FMC's antimicrobial products proposed to be included on the EPA-approved labels of such products, including directions for its use. (Putsavage Decl. ¶ 20.) At no point did Mr. Putsavage ever provide FMC with any legal advice concerning its pesticide or other patents, the inclusion of patent numbers on its pesticide product labels, or other non-FIFRA regulated text. (Putsavage ¶ 26.) Moreover, according to Plaintiff, Mr. Putsavage was never privy to any proprietary or confidential information concerning FMC's strategies for marketing, labeling, or advertising its pesticide products with indicia that these products were patent-protected. (Id. ¶¶ 15, 26.)

      **B.**     **The Nature of the Present Lawsuit Against the Former Client**

The current lawsuit against FMC, brought by Mr. Putsavage on behalf of AgSaver, alleges only that FMC, in violation of section 292 of the Patent Act,[1] marked, affixed, and/or advertised

---

[1] Section 292 of the Patent Act provides:

> Whoever, without the consent of the patentee, marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any

several lines of its products as being covered by patents that have expired. (Am. Compl. ¶¶ 60-61, 68-69, 76-77.) The Amended Complaint goes on to aver both that "FMC knew or should have known" that its patents were expired and that "FMC intended to deceive the public" by marking its products with expired patents. (Id. ¶¶ 63, 71, 79.)

To establish a claim for false marking under this section, the plaintiff must demonstrate two elements: (1) the defendant marked an unpatented article, and (2) the defendant intended to deceive the public. Forest Group, Inc. v. Bon Tool Co., 590 F.3d 1295, 1300 (Fed. Cir. 2009). Accordingly, these are the sole legal and factual inquiries at issue.

    **C.**    **Whether, in the Course of the Prior Representation, FMC Might Have Disclosed to Mr. Putsavage Confidences Which Could Be Detrimental to the FMC in the Current Litigation**

Having considered the first two factors of the "substantially-related" test, the Court is now hard-pressed to find the third factor satisfied. Despite the fact that Mr. Putsavage is now acting in an adverse capacity to his former client, Defendant has put forth no evidence that FMC might have disclosed to Mr. Putsavage confidences which could be detrimental to it in the present litigation. By all accounts and exhibits, Mr. Putsavage provided legal advice to FMC solely on regulatory issues, including FMC's strategies and practices with regard to EPA labeling of FMC's pesticide products, none of which are at issue here. In stark contrast, the current litigation requires no inquiry into EPA or FDA labeling requirements, administrative regulations, efficacy protocols, or the substantive contents of any of the products at issue. Rather, the singular focus is on when the named patents were issued, the term of their validity, when they expired, whether Defendant knew or should have

---

    word or number importing the same is patented for the purpose of deceiving the public . . . [s]hall be fined not more than $500 for every such offense.

35 U.S.C. § 292(a).

known that they expired, and whether Defendant acted with an intent to deceive the public. It would have been highly unusual for FMC to have discussed such issues with Mr. Putsavage during the course of his counseling on EPA regulatory issues. The Court thus finds no overlap between Mr. Putsavage's work for FMC and the current litigation, such that he might have acquired confidential information detrimental to Defendant in the current litigation.

The Court remains unswayed by either of Defendant's efforts to link the two representations. First, Defendant contends that "Mr. Putsavage's prior work *directly for FMC* (where Mr. Putsavage counseled FMC as to the contents of FMC's EPA pesticide labels, and where FMC confidentially discussed aspects of its EPA labeling strategy and procedure with Mr. Putsavage) irreconcilably conflicts with his current work *directly against FMC* (where Mr. Putsavage is taking the position that FMC[] intentionally deceived the public by virtue of its EPA labeling procedure)." (Pl.'s Mot. Disqual. 10-11.)

This argument, however, improperly conflates the confidences required for preparing a proper EPA label with the confidences required for proper marking of a patented product for purposes of the Patent Act. Although both are technically "labels," they are entirely different in form, substance, placement, allowability, and governing law. As to the former, FIFRA "is the comprehensive statutory scheme which governs the registration of pesticide products manufactured or offered for sale in the United States." FMC Corp. v. Control Solutions, Inc., 369 F. Supp. 2d 539, 555-56 (E.D. Pa. 2005). A key part of this registration process involves specific labeling requirements. Id. "The EPA requirements address, *inter alia*, label contents and proper label placement. Requirement warning and precautionary statements are based in part, on the toxicity of the pesticide. The EPA has established 'typical precautionary statements' for the different categories of toxicity." Hawkins v. Leslie's Pool Mart, Inc., 184 F.3d 244, 249 (3d Cir. 1999)

11

(citing 40 C.F.R. § 156.10(h)(2)(i)(B)). "Under FIFRA, a pesticide is 'misbranded' if its labeling contains statements that are 'false or misleading in any particular,' the pesticide's labeling does not contain directions for use which are 'necessary for effecting the purpose for which the product is intended,' or 'the label does not contain a warning or caution statement which may be necessary . . . to protect health and the environment.'" Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc., 617 F.3d 207, 214 (3d Cir. 2010) (citing 7 U.S.C. § 136(q)(1)).

Patent marking, on the other hand, is governed by the Patent and Trademark Office ("PTO") and involves an entirely different set of regulations. Unlike EPA labeling, a false marking claim is not concerned with the substance of any particular label, but rather with whether a patent mark is allowed at all. See Hollander v. Etymotic Research, Inc., 726 F. Supp. 2d 543, 547 (E.D. Pa. 2010). In the case of an expired patent, the Supreme Court has held that "an item for which a patent has expired or been denied . . . is unpatented and unpatentable." Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 159 (1989). Accordingly, an article marked with an expired patent is falsely marked under 35 U.S.C. § 292. Pequignot v. Solo Cup Co., 608 F.3d 1356, 1361-62 (Fed. Cir. 2010). As noted above, "[t]o establish a claim for false marking under this section, the plaintiff must demonstrate two elements: (1) the defendant marked an unpatented article, and (2) the defendant intended to deceive the public." Brinkmeier v. Graco Children's Prods Inc., __ F. Supp. 2d __, 2011 WL 772894, at *4 (D. Del. Mar. 7, 2011) (citing Forest Grp., 590 F.3d at 1300).

Given the drastic differences in these legal areas, the court cannot find that Mr. Putsavage's prior representation of Defendant is substantially related to the present matter. While Mr. Putsavage may have been privy to confidences divulged by FMC with respect to its intent in formulating and affixing proper EPA labels regarding the substance, hazards, and usage instructions for its pesticide products, nothing in the record suggests that he was privy to any information about whether FMC

falsely marked its products with expired patents with an intent to deceive the public.[2]

Nor is the Court convinced by Defendant's second argument that by previously representing FMC, Mr. Putsavage had direct insight into FMC's general intent regarding its labeling of its pesticides, thereby subjecting Defendant to a breach of confidences. In support of its position, Defendant cites to the case of Jordan v. Philadelphia Hous. Auth., supra. In that case, the plaintiff brought claims under 42 U.S.C. § 1983 and 43 Pa. C.S. § 1421 arising from the Philadelphia Housing Authority's ("PHA") decision to terminate plaintiff's employment as an officer in alleged retaliation for comments he made about PHA supervisors. 337 F. Supp. 2d 670. Plaintiff's attorney, Michael Pileggi, had previously been employed as in-house counsel for PHA, although not during plaintiff's termination. Id. In the course of his prior employment, Mr. Pileggi had represented the PHA in another litigation where a plaintiff had brought a false arrest and false imprisonment claim against both the arresting PHA officer and the PHA itself. Id. That prior case involved extensive inquiry into PHA's policies and practices with respect to investigations of complaints brought against its officers. Id. at 675. Thereafter, in the present case, Mr. Pileggi, now representing the plaintiff, asserted that the facts acquired in that previous case were indeed relevant to the plaintiff's claim. Id. The court found that by previously obtaining confidence relevant to the

---

[2] Defendant cites the case of Sunbeam Prods., Inc. v. Hamilton Beach Brands, Inc., 727 F. Supp. 2d 469 (E.D. Va. 2010), wherein the court disqualified counsel based on the fact that counsel had previously represented the defendant on intellectual property matters and was currently bringing an adverse claim against that same defendant also on intellectual property matters. Id. at 473. The court held that "[i]dentity of the intellectual property at issue is not dispositive; substantial relatedness must encompass the underlying legal issues." Id. In that case, the matters being compared involved two separate technologies, but both of which focused on similar intellectual property issues. Id.
   This case is inapposite to the present matter. Mr. Putsavage did not previously do any intellectual property/patent work for FMC and then seek to sue them on the basis of its allegedly expired patents. Rather, he performed EPA pesticide labeling work for FMC, a matter completely unrelated to the patent issue involved in the present case.

present case, Mr. Pileggi had "stepped across the line" and was thus subject to disqualification under Rule. 1.9. Id.

Defendant's argument and reliance on Jordan, however, fails to make the requisite distinction between direct involvement in a specific transaction or subject area and general involvement as counsel for a client. The commentary to Rule 1.9 specifically notes:

> When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client.

PA. RULES OF PROF'L CONDUCT R. 1.9 cmt. (2002). The Jordan case fell into the first category since counsel, in that matter, himself admitted that facts and confidences obtained while representing PHA during the previous case were entirely relevant to his representation of plaintiff Jordan in the current case against the PHA.

This Court finds significantly more guidance from several other cases also involving attorney Michael Pileggi, which tend towards the second category enumerated by Rule 1.9's comment. For example, in Wisdom v. Philadelphia Hous. Auth., No. CIV.A.02-8369, 2003 WL 303945 (E.D. Pa. Feb. 12, 2003), Mr. Pileggi brought a § 1983 claim on behalf of a plaintiff alleging that the PHA violated her due process rights by not providing her an administrative hearing after terminating her section 8 housing benefits. Id. at *1. Defendant PHA sought to disqualify Pileggi since he maintained a supervisory role while serving as PHA's Associate General Counsel and acting as PHA's Directing Counsel in, *inter alia*, landlord-tenant disputes. Id. The court denied the disqualification motion, noting that "while Pileggi may have knowledge of PHA's general approach and strategy as to landlord-tenant litigation matters, as PHA alleges, this

information would likely be irrelevant to the instant case, as it seemingly involves only factual issues about when [plaintiff] petitioned PHA for a hearing." Id.

Similarly, in Blaylock v. Philadelphia Hous. Auth., No. CIV.A.02-8251, 2003 WL 928500 (E.D. Pa. Mar. 5, 2003), Mr. Pileggi brought suit against the PHA on behalf of plaintiff Blaylock alleging failure to administer her tenancy rights to public housing. Id. at *1. Defendant again sought to disqualify Pileggi since, while he was employed at PHA as Associate General Counsel, he received a letter from Blaylock requesting an administrative grievance hearing because PHA was attempting to evict her from public housing. Id. Pileggi testified that he could not recall reading the letter, but indicated that he likely gave it to the Grievance Coordinator, who was responsible for scheduling hearings. Id. Defendants nonetheless based their motion to disqualify on the contention that although Pileggi did not specifically recall any matters relating to Blaylock's dispute with PHA, he "might have acquired confidential information substantially related to the present litigation during his employment at PHA." Id. The court rejected the disqualification motion, holding that "[a]t most, [defendant's evidence] describes in general terms that Pileggi engaged in landlord-tenant disputes similar to Blaylock's while at PHA. However, the accompanying commentary to the Rule of Professional Conduct makes clear that engaging in similar litigation does not violate Rule 1.9." Id. at *2.

In the present case, Defendant has demonstrated only that Mr. Putsavage may have acquired broad knowledge of FMC's general strategies with respect to its products. While Defendant repeatedly argues that Mr. Putsavage advised FMC about the substance of its EPA pesticide labels and has intimate knowledge about FMC's practices in that area, Defendant fails to explain how such knowledge would be, in any manner, detrimental to FMC in this case. Nothing in the records evidences that Mr. Putsavage was involved in applying for the subject patents, was aware of their

15

terms, or might have been privy to any decision by FMC to mark its pesticide products with those patents after they had expired. As repeatedly emphasized above, mere counseling on the substance of EPA-required labels under FIFRA does not translate into knowledge about patent terms and false marking under the Patent Act. Indeed, the products about which Mr. Putsavage offered regulatory advice are not even the same products at issue in this case.

In short, Defendant has not met its burden of showing that the Mr. Putsavage's representation of Plaintiff is impermissible under Rule 1.9. Although Defendant correctly argues that any doubts about the violation of an ethical rule should be construed in favor of disqualification, this Court harbors no such doubts. Mr. Putsavage represented and counseled FMC on subject areas and products wholly separate from the ones at issue here. As the two matters are not substantially related, and as disqualification is generally a disfavored practice, the Court declines to disqualify Mr. Putsavage from representing Plaintiff in this litigation.[3]

An appropriate Order follows.

---

[3] Having determined that Mr. Putsavage should not be disqualified, the Court need not consider Defendant's argument that Carter Ledyard, Mr. Pusavage's current firm, should be disqualified under Pennsylvania Rule of Professional Conduct 1.10(a).